International Milling Company *v.* Hachmeister, Inc., Appellant.

408

Argued October 7, 1954.   Before STEARNE, JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*John A. Metz, Jr.,* with him *Charles L. Cunningham, Metz, McClure, Hanna & MacAlister* and *Stonecipher & Cunningham,* for appellant.

*Frank L. Seamans,* with him *Frank B. Ingersoll, Robert M. Jacob,* and *Smith, Buchanan, Ingersoll, Rodewald & Eckert,* for appellee.

OPINION BY MR. JUSTICE JONES, January 7, 1955:

This appeal grows out of an action of assumpsit instituted by the plaintiff seller for the recovery of damages allegedly sustained through the defendant buyer's breach of contracts for the sale and purchase of wholesale quantities of flour. At the conclusion of the trial, the learned trial judge directed a verdict for the plaintiff for a specific sum of money. Subsequently, the court en banc (one judge dissenting) denied the defendant's motion for a new trial. From the judgment entered on the verdict, the defendant took this appeal. The members of the court who sat for the argument of the appeal are unanimously of the opinion that the case involves material issues of fact which it is the jury's province to resolve. The judgment must, therefore, be reversed and a new trial ordered.

Despite the voluminous record (the pleadings alone, with exhibits, take up 151 pages of the printed record), the principal question of law involved is a

narrow one. Did the specifications for the flour, which the defendant sought to prove the plaintiff had breached, violate the parol evidence rule by ascribing to the agreement of the parties matter which their integrated contracts did not contain? The court below answered "yes" and accordingly ruled out the buyer's defense on the merits. We think that was plainly error.

The plaintiff (seller) and the defendant (buyer) executed five identical contract forms for the sale and purchase of specified quantities and qualities of flour to be milled by the seller. The forms were the uniform flour contract form for the milling and baking industries as approved by the Millers' National Federation and the American Bakers' Association. The contract forms, as executed by the parties, were severally dated September 11, 1947, October 13, 1947, November 12, 1947 (two), and February 9, 1948, and each concluded with the printed provision that "This Contract constitutes the complete agreement between the parties hereto; and cannot be changed in any manner except in writing subscribed by Buyer and Seller or their duly authorized officers." According to the averments and testimony of the defendant, the contract forms did not fully or correctly reflect the whole of the understanding of the parties at the time of their execution and that a material provision was deliberately omitted therefrom at the seller's insistence but with the understanding that it would be separately agreed to by the seller by way of a contemporaneous letter from the seller to the buyer which was transmitted.

Negotiations between the plaintiff and the defendant looking to the sale and purchase of flour culminated in a meeting of authorized representatives of both the seller and the buyer in the offices of the latter at Pittsburgh on September 11, 1947. Agreement

between the parties was substantially reached at that time. The buyer's president there stated that the written specifications prescribed by the American Institute of Baking, of Chicago, Illinois, for flour intended for human consumption should be incorporated in the contracts. The seller's representative replied that this could not be done since "these milling contracts . . . are uniform all over the country and they didn't want to violate the normal contract." He suggested, however, that when he and his co-representative of the seller returned to Detroit they would write a letter tying in the buyer's specifications in its subsequent purchase orders and that under those circumstances the buyer should be satisfied. Thereupon, at the conclusion of the meeting of September 11th, the buyer delivered to the seller *a purchase order,* dated the same day of the meeting, for a certain quantity of flour under the contemplated contracts when executed. The purchase order stated, inter alia, that "This flour to be guaranteed to meet specifications attached, which are part of this order. Understanding is that one (1) pound sample of flour will be submitted to the American Institute of Baking, 1134 Fullerton Avenue, Chicago, Illinois, for test before shipment is made of any car. Also understand we are going to make check analysis upon arrival of car, such analysis also to be made by the American Institute of Baking." The attached specifications are identical forms to those similarly attached to three subsequent purchase orders. They contain a list of unclean foreign substances of which the flour was to be relatively free in order to guarantee the product fit for human consumption. On the same day, viz., September 11th, the seller, by telegram, accepted the purchase order.

The next day (September 12th) the seller forwarded contract forms for the buyer's signature. These

forms made no reference whatsoever to the buyer's purity specifications as recited in the order already accepted by the seller. But, on the same day (September 12th) one of the salesmen who, in part, had represented the seller at the meeting of September 11th, sent the buyer a letter assuring deliveries of flour *in compliance with the buyer's purity specifications*. This salesman testified at trial that the letter was prepared and sent with the knowledge and approval of his co-representative with whom he had discussed the matter after the meeting of September 11th. The letter stated: "This will confirm our agreement made in your office on September 11. Before any flour is shipped to you, a sample will be sent to the American Institute of Baking, to determine the extraneous matters that may be in the flour. We feel, that for the greater part, our flour will have no extraneous matters of any kind, but as a check, to be sure that you will never receive any, your car will be held until such time as we get a satisfactory report back from the American Institute of Baking. When a car arrives at your siding, you will take samples from the car and also send them to the American Institute of Baking as a double check, and if they should report that this flour does not come up to specifications, that flour will be diverted from your siding, and replaced with satisfactory flour. We are very interested in cooperating with the food inspectors in this matter, and you can be assured that we will cooperate with you 100% in meeting your requirements."

Subsequent to the sale and purchase agreement of September 12, 1947, the parties executed the other four additional contract forms already mentioned. Each of those contracts, identical in form with the contract dated September 12th, was preceded by the buyer's corresponding purchase order. And, in respect

of the second, third and fourth purchase orders, they were expressly made subject to the seller's guarantee of compliance with attached specifications which were the same as already indicated above in connection with the purchase order of September 11, 1947.[1] In fact, the third and fourth executed contract forms, being those dated November 12, 1947, each specifically mentions the buyer's corresponding purchase order number and states that "This P.O. [purchase order] number to appear on all invoices."

Beginning on March 9, 1948, and continuing thereafter, the seller shipped and the buyer received and accepted the first nine railroad cars of flour delivered in pursuance of the purchase agreements. The buyer also subsequently accepted two more carload shipments but rejected and refused to accept six carloads because of failure of the flour to meet the specifications referred to in the purchase orders. Of the six cars so rejected, four were returned to and accepted by the seller; one more carload lot was condemned by United States officials as unfit for human consumption; and another carload, when its return was refused by the seller, was sold by the buyer for use as animal food. To make the breach complete, the buyer's president, by letter dated June 28, 1948, notified the seller that all contracts between the parties were cancelled as of June 18, 1948, since the seller had failed to deliver flour which met the specifications agreed upon between

[1] The exact wording contained in the series of purchase orders was as follows. Purchase Order No. 19197, dated October 14, 1947: "This flour to be guaranteed to meet specifications attached"; Purchase Order No. 19410, dated November 12, 1947: "This flour to be guaranteed to meet specifications attached regarding insect fragments"; and Purchase Order No. 19432, dated November 13, 1947: "This flour to be guaranteed to meet specifications attached regarding insect fragments."

them. The seller acknowledged receipt of the buyer's letter of repudiation by a letter dated June 30, 1948, and therein notified the buyer that a statement of damages occasioned by the breach would follow.

We believe we have related sufficient of the testimony which, if believed by the jury, would establish that the specifications for the flour, insisted upon by the buyer from the outset, were a very definite and important part of the agreement of the parties and that to permit the seller to exclude the specifications from the form contracts of the parties, as being violative of the parol evidence rule, would be to use that beneficent principle to enable the seller to work a fraud upon the buyer.

The parol evidence rule, as is well known, provides that where parties to an agreement commit their undertakings to a writing with the intention that it shall formally and comprehensively evidence the terms of their agreement, the writing, when executed by the parties, cannot thereafter be made subject to parol alteration, contradiction or variance by way of agreements or understandings had prior to or contemporaneously with the execution of the writing. And, so, the parol evidence rule insures the integrity of written memorials adopted by the parties to an agreement as evidencing the whole of their contractual undertakings. But, while the salutary effect of the rule is not lightly to be impaired by exceptions, evidence of prior or contemporaneous agreements of the parties is admissible to alter, contradict or vary the terms of their writing where the omissions therefrom occurred by reason of either fraud, accident or mistake. See, e.g., *Gianni v. Russell & Co., Inc.,* 281 Pa. 320, 126 A. 791; *Bardwell v. The Willis Company,* 375 Pa. 503, 100 A. 2d 102, and cases there cited.

It is the appellant's contention that, in the light of the provable circumstances, the plaintiff's use of the stereotyped contract forms as the completely integrated contracts of the parties constitutes a fraud which obviates present applicability of the parol evidence rule. Accordingly, the appellant contends that the evidence as to the specifications attached to the purchase orders, the letter of September 12, 1947, from the seller's agent to the buyer confirming the understanding of the parties that the flour was sold subject to compliance with such specifications, and the testimony as to the negotiations of the parties at the meeting in Pittsburgh on September 11, 1947, was admissible to integrate properly the entire agreement of the parties.

On the other hand, the seller maintains (and the court en banc so decided) that the five printed uniform contracts which include the statement that the entire agreement of the parties is therein expressed constitute fully integrated contracts not subject to alteration, contradiction or variance by parol. The seller further asserts that the fraud alleged by the buyer, even if true, is not such fraud as stays the exclusionary operation of the parol evidence rule, the fraud being merely the breach of a promise to do something *in futuro*, citing *Gianni v. Russell & Co., Inc.*, supra, and other cases. The seller also argues that, even if the buyer's averments of fraud were adequate and sufficient to avoid operation of the parol evidence rule, such averments were not competently sustained by evidence of the character which the law requires in the premises, namely, evidence that is "clear, precise and indubitable" or, as it is otherwise sometimes stated, evidence that is "clear and convincing", citing, inter alia, *Gerfin v. Colonial Smelting & Refining Company, Inc.*, 374 Pa. 66, 67-68, 97 A. 2d 71; and *Wagner v.*

416

*Somerset Memorial Park, Inc.,* 372 Pa. 338, 341, 93 A. 2d 440.

In the instant case the defendant alleged and adduced or proffered evidence to support its allegations that the five printed-form contracts were not intended by the parties to express their *entire* understanding; that the buyer had demanded that purity specifications, which it required, be made part of the form contract; that the seller refused so to do for reasons peculiar to its own general policy but suggested that the matter of the specifications be covered by delivery of a cognate letter from the seller to the buyer; that the buyer thereupon gave the seller a purchase order which embodied the specifications and which order the seller promptly accepted; that the next day a letter tying the specifications to the contract was dispatched by the seller to the buyer; and that, on the same day, the seller submitted for the buyer's execution contract forms which made no mention of the specifications.

The buyer contends that for the seller to submit, in the foregoing circumstances, for the buyer's execution, contract forms containing a stereotyped integration clause without informing the buyer that it (the seller) intended later to assert and insist upon the full legal force and effect of the integration clause, notwithstanding the parties' collateral understanding evidenced by the seller's contemporaneous letter to the buyer, constituted fraud such as renders inoperative the exclusionary effect of the parol evidence rule. Stated otherwise, by procuring authorization to omit the purity specifications from the written contract forms in exchange for the seller's promise to cover that matter in a separate writing, which it forthwith transmitted, and then invoking the printed clause of the contract form purporting to integrate the parties' understanding, the seller became *eo instante* guilty of

vitiating fraud. The defendant's allegations being supported by evidence which, if believed by the jury, justifies a finding of fraud, it follows that the exclusionary effect of the parol evidence rule would thereby be obviated. The underlying issues of fact were peculiarly matters for the jury's resolution.

In support of its argument that the buyer's allegation of fraud is nothing more than a promise which was unfulfilled and that a promise to do something in the future, even of the promise be not fulfilled, is not such fraud as avoids operation of the parol evidence rule, the seller cites *Gianni v. Russell & Co., Inc.,* supra; *First National Bank of Hooversville v. Sagerson,* 283 Pa. 466, 129 A. 333; *Humphrey v. Brown,* 291 Pa. 53, 139 A. 606; *Fidelity Title and Trust Co. v. Garland,* 291 Pa. 297, 139 A. 876; *Emmanuel v. Hughes,* 295 Pa. 492, 145 A. 586; *Hein v. Fetzer,* 301 Pa. 403, 152 A. 388; and *Blose v. Martens,* 173 Pa. Superior Ct. 122, 95 A. 2d 340. The rule to which the seller makes reference is not presently applicable. In none of the cases cited was it charged that a term was omitted from a contract at the insistence of one party who, although agreeing to incorporate the omitted term in a separate writing, nevertheless, employed a printed contract form which denominated itself the entire agreement of the parties. Contrary to the conception of the learned court below, this case is not merely an instance of a broken promise. Rather, if the jury believes the evidence adduced by the defendant, it is an illustration of deliberate misrepresentation. The presence of an integration clause cannot invest a writing with any greater sanctity than the writing merits where, as here, it assertedly does not fully express the essential elements of the parties' undertakings.

Nor is there any requirement that a contract be evidenced by a single instrument. If contracting parties

choose, they may express their agreement in one or more writings and, in such circumstances, the several documents are to be interpreted together, each one contributing (to the extent of its worth) to the ascertainment of the true intent of the parties: *Housing Mortgage Corporation v. Allied Construction, Inc.*, 374 Pa. 312, 319, 97 A. 2d 802. And, where it can be shown by competent evidence that no single writing embodied or was intended to embody the whole of the parties' understanding, the parol evidence rule has no application: *Rekas v. Dopkavich*, 362 Pa. 292, 297-298, 66 A. 2d 230. In *Howell v. Wheelock*, 115 Pa. Superior Ct. 599, 602-603, 176 A. 252, it was said that "Although the Supreme Court in some of the late cases . . . made more stringent the rules respecting the admission of evidence to vary and alter written instruments, none of the cases have held that under all circumstances oral evidence is inadmissible to explain the intention or the action of the parties to a written instrument. If, as alleged, this defendant objected to the terms of the provision in the lease respecting the continuation thereof after the expiration of five years, and, at the suggestion of plaintiffs' agent, he sent along with the executed lease a writing stating that the lease was to terminate at the end of five years, and this written modification to the printed form used was received and accepted, it became an integral part of the lease and was just as binding and effective as if the writing had been physically attached to or embodied in the original instrument." See, also, *Wilson v. Viking Corporation*, 134 Pa. Superior Ct. 153, 159, 3 A. 2d 180.

In *Calderoni v. Berger*, 355 Pa. 418, 421, 50 A. 2d 332, where the plaintiff had purchased an automobile from the defendants and, in connection with the purchase, the parties executed an agreement of sale, a bailment lease and a receipt, the question involved was

whether the plaintiff established an agreement by the defendants to secure public liability insurance for the plaintiff's protection. The defendants contended that the bailment lease constituted the only contract between the parties and that the parol evidence rule excluded consideration of the agreement of sale and the receipt. Speaking for this court, Mr. Justice STEARNE declared that, ". . . it is clear that the parties did not intend the written bailment lease to constitute the final and complete contract between them. . . . There was an interrelation between the writings and the parol testimony which required the action of the jury to determine what was the contract between the parties. . . . That the construction of this contract is a jury question is manifest. The issue is what insurance defendants agreed to supply. The agreement of sale states *fire, theft and property damage* . . . ; the lease names *fire and theft;* the receipt states that it was *property damage and liability;* the parol evidence was that it was *property damage* . . . , *fire, theft and liability insurance.* . . . [S]uch a situation '. . . *becomes a question for the jury to determine what the parties actually meant.*' "

The testimony adduced by the buyer was sufficient in quality and quantity, if accredited by the jury, to support a finding of the alleged fraud. The issue as to the extent of the parties' contractual undertakings should, therefore, have been submitted for the jury's determination. The seller's contention that the buyer's evidence in such connection, instead of being clear and convincing, was vague and uncertain is not well founded. The fact that some of the witnesses failed to recall incidental details with specificity does not detract from their testimony as a whole which was clear and convincing with respect to the parties' intended engagements. In addition to the oral and documentary evi-

dence, to which we have referred, further corroboration that the purity specifications were accepted by all as being a part of the agreements is to be found in the record by way of correspondence of the parties and the seller's inter-office memoranda. It is true that the seller disputes the authority of its salesman to write the above-quoted letter of September 12, 1947, but it is equally true that the testimony shows that the seller's chief negotiator at the meeting in Pittsburgh on September 11, 1947, gave assurances that such a letter would be written and actually approved of the letter as written and transmitted. On the basis of the evidence as a whole, the jury might have justifiably found that the contractual agreements of the parties were not restricted to the matters set forth in the five executed printed forms.

That brings us to the seller's argument, in the alternative, that, even assuming the agreement of the parties was as the buyer alleges, still the buyer failed to adduce any competent evidence to prove the default ascribed to the seller, viz., failure to deliver flour conforming to the specifications contractually imposed. The buyer, on the contrary, contends that the requisite proof of the seller's default was contained in the proffered reports of the American Institute of Baking which the trial court excluded, on the plaintiff's objection, as being hearsay. The buyer assigns several reasons why the ruling was error, only one of which it is presently necessary to consider, namely, that, by virtue of the agreement of the parties, as pleaded and proven by the buyer, the reports were not hearsay but agreed-upon definitive proofs.

Among the specifications, which the buyer's proofs show were a part of the entire contract, was an overall provision that the flour, which the seller was to deliver, would not contain more than 35 insect fragments per

pound. The parties selected the American Institute of Baking as an independent agency for determining specification compliance by analyzing samples of the flour and reporting whether the inspected flour met the purity specifications required. Accordingly, the buyer argues that, regardless of the accuracy or inaccuracy of the analyses, if the American Institute of Baking reported that the flour did not comply with the specifications, the seller was to take it back and replace it with satisfactory material. If such were in fact the understanding of the parties, then the reports of the Institute's findings were not hearsay and, consequently, were erroneously excluded as evidence by the trial court.

If the reports of the Institute had been admitted, there would then have been sufficient evidence for a jury to find that, if the specifications were a part of the parties' agreement, the seller was in default. The reports of the Institute actually disclosed that the insect fragment count in the flour delivered by the seller ranged from a low of 70 to a high of 576 fragments per pound, whereas the maximum permissible count was, as already indicated, an average of 35 fragments per pound. It follows, therefore, that any lack of evidence in the record to sustain the buyer's allegation of the seller's default resulted not from the buyer's failure to proffer such evidence but from the learned trial judge's erroneous refusal to admit in evidence the reports of the Institute.

Since the case goes back for a retrial, it becomes unnecessary to discuss the appellant's remaining contentions that, apart from any question as to the specifications required by the buyer, the trial court erred in failing to submit to the jury the question whether the flour delivered by the seller was merchantable and fit for human consumption (see Section 15 of The Sales

Act of May 19, 1915, P.L. 543, 69 PS § 124) and that the court also erred in directing a verdict for the plaintiff when the plaintiff's proofs of its damages rested, in material part, on the oral testimony of a witness. Of course, so far as essential proofs are oral, their submission for the jury's determination is required: cf. *Nanty-Glo Boro. v. American Surety Co.*, 309 Pa. 236, 163 A. 523.

Judgment reversed with a v.f.d.n.