PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 17-3148 & 17-3231
_____

THOMAS SKÖLD,

Appellant in 17-3148

v.

GALDERMA LABORATORIES L.P.; GALDERMA
LABORATORIES, INC.;
GALDERMA S.A.; NESTLE SKIN HEALTH S.A.,

Appellants in 17-3231
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-14-cv-05280)
District Judge: Hon. Wendy Beetlestone
_____

Argued
October 30, 2018

Before:  CHAGARES, JORDAN, and VANASKIE,[*] *Circuit Judges*

(Filed: February 26, 2019)
_____

Bruce W. Clark [ARGUED]
Christopher J. Michie
Clark Michie
220 Alexander Street
Princeton, NJ  08540

Michael D. LiPuma
325 Chestnut Street – Ste. 1109
Philadelphia, PA   19106
        *Counsel for Thomas Sköld*

Benjamin L. Mesches
Haynes & Boone
2323 Victory Avenue – Ste. 700
Dallas, TX  75219

---

[*] The Honorable Thomas I. Vanaskie retired from the Court on January 1, 2019 after the argument and conference in this case, but before the filing of the opinion.  This opinion is filed by a quorum of the panel pursuant to 28 U.S.C. § 46(d) and Third Circuit I.O.P. Chapter 12.

Joseph Lawlor
Richard D. Rochford, Jr. [ARGUED]
Haynes & Boone
30 Rockefeller Center – 26th Fl.
New York, NY  10112

*Counsel for Galderma Laboratories L.P.; Galderma Laboratories, Inc.; Galderma S.A.; Nestle Skin Health S.A.*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

This case proves once again that people will fight for a catchy name.  Thomas Sköld sued his former business partner, Galderma Laboratories L.P. ("Galderma"), alleging that its use of the trademark "Restoraderm" constitutes trademark infringement, false advertising, unfair competition, breach of contract, and unjust enrichment.  In the District Court, only Sköld's unjust enrichment claim was successful.  He now appeals the Court's refusal to direct a verdict in his favor on infringement and its denial of his post-trial motions.  Galderma cross-appeals,[1] arguing that Sköld does not own the

[1]  The District Court granted judgment on Sköld's unjust enrichment claim against Defendants Galderma L.P., Galderma S.A., and Nestle Skin Health S.A, but not against Galderma Laboratories, Inc. because "the 2004 Agreement precluded that claim against [Galderma Laboratories,] Inc. as CollaGenex's successor-in-interest."  Accordingly, Galderma Laboratories, Inc. did not cross-appeal.

3

Restoraderm mark and that the unjust enrichment verdict cannot stand. For the reasons that follow, we will affirm in part and reverse in part the judgment entered by the District Court and will thus absolve Galderma of liability.

## I.    BACKGROUND

### A.    Factual History[2]

Sköld is an inventor and entrepreneur. He coined the name "Restoraderm" for a proprietary drug-delivery formulation that he developed for potential use in skin-care products. In the early 2000s, he began searching for a partner to help produce and sell Restoraderm products. To that end, he attended a dermatology conference in 2002, where he presented a publication on Restoraderm and distributed samples of a potential product.

Even before that, Sköld had attracted the interest of CollaGenex, a skin-care company that was later acquired by Galderma. CollaGenex and Sköld began negotiations to

---

[2] While a post-trial motion for judgment as a matter of law is given plenary review, we generally assume the jury properly found facts. *Mancini v. Northampton Cty.*, 836 F.3d 308, 314 (3d Cir. 2016). The facts recounted here are consistent with Sköld's perspective, despite our ultimate disagreement with the legal conclusion he seeks. *Cf. id*. ("Because the jury returned a verdict in favor of the plaintiff, we must examine the record in a light most favorable to the plaintiff, giving [the plaintiff] the benefit of all reasonable inferences, even though contrary inferences might reasonably be drawn.")

establish a co-development partnership, and, after several months, they executed a letter of intent. The letter, signed in 2001, stated that "[a]ll trade marks associated with the drug delivery system; the proposed intellectual property; products deriving therefrom and products marketed or to be marketed by CollaGenex and/or any commercial partner of CollaGenex anywhere in the world shall be applied for and registered in the name of CollaGenex and *be the exclusive property of CollaGenex*." (App. at 1456 (emphasis added).)

Then, in 2002, Sköld and CollaGenex signed a contract they titled the "Co-Operation, Development and Licensing Agreement" (the "2002 Agreement"). Under its terms, "[a]ll trade marks applied for or registered (including 'Restoraderm') shall be in the sole name of CollaGenex and *be the exclusive property of CollaGenex* during the Term and thereafter[.]" (App. at 1465 (emphasis added).) A survival provision stipulated that vested rights would outlive the term of the agreement. In particular, that provision said, "[a]ny termination under this Agreement … shall not affect in any manner vested rights of either party arising out of this Agreement prior to termination." (App. at 1469.)

After the 2002 Agreement was executed, CollaGenex issued a press release announcing its plans to develop a Restoraderm product line. It proudly publicized that "it ha[d] licensed a novel … technology … named Restoraderm(TM)… [that would] form the basis for a novel, proprietary and differentiated portfolio of topical dermatological pharmaceuticals." (D.I. 78-5 at 676). With Sköld's cooperation, CollaGenex promptly applied to register the Restoraderm mark with the United States Patent and Trademark Office (the "PTO").

5

Two years later, Sköld and CollaGenex replaced their 2002 Agreement with an Asset Purchase and Product Development Agreement (the "2004 Agreement"). Under the 2004 Agreement, Sköld transferred "Restoraderm Intellectual Property" and related goodwill to CollaGenex. (App. at 1479.) "Restoraderm Intellectual Property" was defined to include patent rights and associated know-how. (App. at 1478.) While separate provisions addressing trademark rights were initially contained in a draft of the 2004 Agreement, those provisions were removed prior to finalization of the document. Sköld later admitted at his deposition that their removal was "probably" because CollaGenex already owned the Restoraderm trademark.[3] (D.I. 76-23 at 351-352.)

---

[3] Q. Now, you'll see here that in Mr. Glazer's email to you, as we talked about this morning, he cites, "Also, Collagenex has informed me that it already owns the Restoraderm trademark. Accordingly, are there any other trademarks that you own that should be assigned to Collagenex relating to this technology? If there's not, we can delete these trademark provisions from the agreement." Now, in fact, that's what happened; isn't that correct, sir? The trademark provisions that we just looked at in Exhibit F in Section 1.20 and 1.24 were removed, were deleted or removed from the draft; isn't that correct?
A. I don't know when, but it's apparent that it is not in the signed version, and I imagine that that is due to that I didn't have any other names that they were interested in to be part of the asset.
Q. Okay.
A. So your conclusion is probably right.

6

In 2008, Galderma bought CollaGenex. Afterwards, it conducted two analyses of its newly acquired intellectual property portfolio. Both analyses proposed using Restoraderm as a brand name, given its strength and implicit associations with skin restoration, but the suggestion was to use the name on products employing other technologies, not Sköld's.[4]

By early 2009, Galderma decided in fact to use the Restoraderm mark on products that did not use Sköld's technology. While Galderma informed its employees of that plan, it did not inform Sköld. He later heard a rumor that Galderma was abandoning his technology, so, in June 2009, he confronted an executive but was told he "shouldn't take any notice of [the rumor]." (App. at 242:13-14.) Actually, he should have, because, in November 2009, Galderma terminated the 2004 Agreement.[5]

(D.I. 76-23 at 351-352.)

[4] The analyses were conducted in 2008 and 2009. The 2008 analysis noted that the "[a]greement with the inventor [Sköld] could be stopped at any time." (App. at 1791.) The 2009 analysis noted that the Restoraderm mark "fits well with the concept of barrier repair/restoration[,]" and that the name "implies barrier repair/restoring and is appreciated by the HCP [("Health Care Professional")] community." (App. at 1649.)

[5] After the partnership ended, Sköld petitioned the United States Patent and Trademark Office to cancel CollaGenex's (then Galderma's) registration of the

7

After that, Sköld sent Galderma a list of assets for it to return, including the Restoraderm trademark. Galderma did not surrender the mark and instead responded that "we are [the] owner of this trade name" and that Sköld should not "use this name anymore in your communication on the technology." (App. at 1670.) Sköld conceded in reply that Galderma was "for now, the rightful owner until your position is challenged." (App. at 1669.)

Sköld sought and eventually found new co-development partners for his skin-care technology.[6] The resulting products, both nascent and on the market, are based on the original Restoraderm technology but do not bear the Restoraderm mark.[7] In the meantime, Galderma's Restoraderm product line has enjoyed international success.

## B.    Procedural History

In September 2014, Sköld filed this suit against Galderma. He alleged trademark infringement, unfair

---

Restoraderm mark. The contest over that petition remains pending.

[6] Finding new partners was difficult for Sköld because of Galderma's success and the resulting brand recognition of Restoraderm. "Various companies did not feel comfortable discussing business with Sköld about RESTORADERM and RESTORADERM technology, given Galderma's use of the trademark." (App. at 1756.)

[7] Sköld tried to register a similar trademark for his products – Restoraderm Lipogrid – but Galderma opposed it.

8

competition, and false advertising under the Lanham Act, and breach of contract, unfair competition, and unjust enrichment under Pennsylvania law.

Galderma moved for summary judgment, alleging that Sköld did not own the Restoraderm mark. *Sköld v. Galderma Labs., L.P.*, No. 14-5280, 2016 WL 724755, at \*2 (E.D. Pa. Feb. 24, 2016). The District Court disagreed and concluded that, despite the language in the 2002 Agreement with respect to trademark ownership, the 2004 Agreement voided any ownership rights that Galderma had in the mark. *Id.* The Court also considered a provision in the 2004 Agreement stating, "Sk[ö]ld shall sell, transfer and deliver to CollaGenex … all goodwill, if any, relating to the [Restoraderm Intellectual Property]." (App. at 1479;) *Sköld*, 2016 WL 724755, at \*5. Whether that provision encompassed, and thus again transferred, the Restoraderm mark to CollaGenex was something the District Court decided should await further fact-finding. *Id.* at \*5-6. The Court therefore denied summary judgment. *Id.* at \*6.

The case went to trial and, assuming he would win on the question of ownership of the mark, Sköld asked the District Court to direct the jury to find a likelihood of confusion due to Galderma's use of an identical mark on similar skin-care products. The Court denied that request.

The jury decided that Sköld was the rightful owner of the mark and that he had proven unjust enrichment. Nonetheless, the jury also concluded that Sköld had failed to establish his claims for infringement, unfair competition, false advertising, and breach of contract. According to the special interrogatories returned with the verdict, the jury concluded,

9

on the infringement and unfair competition claims, that Sköld had failed to demonstrate a likelihood of confusion, despite the identical word mark being used on skin-care products similar to ones Sköld had developed. The jury likewise concluded that, with respect to the false advertising claim, Galderma's use of the Restoraderm mark had no capacity to deceive.

Both Sköld and Galderma filed post-trial motions. Sköld moved for judgment as a matter of law or a new trial on his claims, except for his successful unjust enrichment claim, as to which he sought a new trial on damages and declaratory relief confirming the jury's finding in his favor. Regarding the trademark infringement and false advertising claims, he argued that the District Court had erred in denying his motion to direct a judgment on likelihood of confusion. Moreover, he argued, declaratory and injunctive relief was warranted and should have been granted. Galderma argued in its post-trial motion that Sköld's unjust enrichment claim should be rejected on both substantive and procedural grounds. The Court granted Sköld's request for a declaration as to unjust enrichment, but otherwise denied the motions.

In this appeal, Sköld argues that the District Court erred by failing to direct the jury on likelihood of confusion, as he had asked, and by denying his post-trial motions with respect to infringement, false advertising, and the remedy for his unjust enrichment claim. Galderma has cross-appealed and argues that Sköld does not own the Restoraderm mark. It also seeks dismissal of the unjust enrichment judgment.

10

## II.   DISCUSSION[8]

Ownership of the Restoraderm mark is the dispositive issue in this case, and, on this record, it is a matter of contract interpretation subject to plenary review.[9]  At the end of the day, we conclude that Galderma is the rightful owner.  The 2002 Agreement unambiguously provided for transfer of the mark to Galderma's predecessor in interest, CollaGenex.  Upon registration of the mark, that ownership became vested and was confirmed for all the world to see.  Even assuming that the 2004 Agreement completely superseded the 2002 Agreement, it did nothing to disturb those vested rights.  The ownership issue should not have gone to the jury.

A contract provision is ambiguous if it is susceptible to two reasonable interpretations.  *Duquesne Light Co. v.*

---

[8]   The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1338(a) and (b).  We have jurisdiction pursuant to 28 U.S.C. § 1291.

[9]   "We exercise plenary review over the District Court's legal conclusions …." *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 279 (3d Cir. 2001).  The determination of "[w]hether a contract is ambiguous is an issue of law subject to plenary review." *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 419 (3d Cir. 2013).  And we review the interpretation of an unambiguous contract de novo. *See Tamarind Resort Assocs. v. Gov't of Virgin Islands*, 138 F.3d 107, 110 (3d Cir. 1998) ("[I]t is a fundamental principle of contract law that 'disputes involving the interpretation of unambiguous contracts are resolvable as a matter of law[.]'" (citation omitted)).

11

*Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995). Ambiguity arises when language "is obscure in meaning through indefiniteness of expression or has a double meaning." *Id.* "A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends ...." *Id.* (quoting *Samuel Rappaport Family P'ship v. Meridian Bank*, 657 A.2d 17, 21–22 (Pa. Super. Ct. 1995)).[10]

From the outset, the dealings between Sköld and Galderma's predecessor in interest, CollaGenex, demonstrated a clear intent that CollaGenex would own the trademark at issue. As the 2001 letter of intent put it: "[a]ll trade marks associated with [Restoraderm intellectual property and products] ... shall be applied for and registered in the name of CollaGenex and be the exclusive property of CollaGenex." (App. at 1456.) That intent was confirmed again in the 2002 Agreement, which said that, upon application with the PTO for registration of the Restoraderm mark, CollaGenex would be the sole owner of the mark. The language of the agreement is straightforward: "[a]ll trade marks applied for or registered (including 'Restoraderm') shall be in the sole name of CollaGenex and be the exclusive property of CollaGenex during the Term [of the agreement] and thereafter[.]" (App. at 1465.)

Beyond broadly affirming that any trademarks applied for during the term were the sole property of CollaGenex, the 2002 Agreement explicitly identified the Restoraderm mark.

---

[10] It is undisputed that both the 2002 and 2004 Agreements are governed by Pennsylvania law.

12

Accordingly, by the terms of the agreement, when CollaGenex applied to register "Restoraderm," the mark became CollaGenex's sole property. And, when the 2002 Agreement said the Restoraderm mark would "be the exclusive property of CollaGenex during the Term [of the agreement] *and thereafter*[,]" it demonstrated clearly the parties' intent that the mark was to remain CollaGenex's property, regardless of any termination of the agreement. (App. at 1465.)

That conclusion is confirmed by another provision in the 2002 Agreement. Because it created rights that would outlive its term,[11] the agreement included a provision addressing those rights, titled "Term and Termination and Reversion of Rights." (App. at 1468.) That provision stated that "[a]ny termination [of the 2002 Agreement] ... *shall not affect in any manner vested rights* of either party arising out of this Agreement prior to termination." (App. at 1469 (emphasis added).) In other words, the 2002 Agreement unambiguously stipulated that, in the event of any termination, vested rights would survive. CollaGenex's right to Restoraderm vested upon its application for registration of that mark, and when the parties voluntarily terminated the 2002 Agreement that right remained unaffected. The survival provision reinforces that the transfer provision is not susceptible to another reasonable interpretation. Thus, the 2002 Agreement plainly and permanently transferred to

---

[11] "Term," as used in the trademark transfer provision of the 2002 Agreement, was defined as "the term of this Agreement and any extension thereto as defined herein." (App. at 1458.) The term of the Agreement was tied to the life of patent rights Sköld had acquired.

13

CollaGenex all ownership rights in the Restoraderm mark, once application to register the mark was made.

The 2004 Agreement did not change that. The subject matter of the 2004 Agreement was limited to "Restoraderm Intellectual Property." On its face, that might appear to include trademarks, but the term "Restoraderm Intellectual Property" is precisely defined and limited to patent rights, know-how, and the right to enforce those proprietary rights. To his credit, Sköld acknowledges that, in the 2004 Agreement, "[t]he definition of 'Restoraderm Intellectual Property' did *not* include trademarks." (Sköld Opening Br. at 10.) That concession is sensible since the 2004 Agreement does not identify or address the Restoraderm mark in particular, nor does it address trademarks generally. While the 2004 Agreement may have been designed to replace and terminate the 2002 Agreement, it cannot fairly be interpreted as recovering ownership of the Restoraderm trademark for Sköld. Not a word is said about such a significant step. The mostly boilerplate integration clause in the 2004 Agreement did not silently unwind the vested trademark rights, especially given the parties' very plain statement in the 2002 Agreement that, in the event of a termination of that earlier agreement, the ownership rights in the Restoraderm mark would remain vested. *See Int'l Milling Co. v. Hachmeister, Inc.*, 110 A.2d 186, 191 (Pa. 1955) ("The presence of an integration clause cannot invest a writing with any greater sanctity than the writing merits[.]").

To the extent the integration clause in the 2004 Agreement strayed from boilerplate language, it supports Galderma's ownership of the mark, by succession to CollaGenex's rights. The clause states that it "cancels and

14

supersedes any and all prior negotiations, correspondence, understandings and agreements (including the [2002 Agreement]) whether oral or written, between the Parties respecting the subject matter hereof and thereof; provided that nothing in this Agreement shall replace, supercede [sic], cancel or modify any prior agreements or assignments between the Parties that have been filed with the United States Patent and Trademark Office." (App. at 1495.) The clause thus carved out certain rights arising from the 2002 Agreement that would not be superseded or otherwise undone by the 2004 Agreement, namely, agreements and assignments registered with the PTO. Although the 2002 Agreement itself was not filed with the PTO, Sköld does not argue that CollaGenex's ownership, documented at the PTO, is excluded from the 2004 Agreement's intention to not disturb or otherwise affect rights memorialized at the PTO, and we see no sound reason why it would be.

In short, it is apparent that, rather than voiding CollaGenex's ownership of the mark by implication, the parties intended to and did confirm that CollaGenex owned the Restoraderm mark. Galderma later succeeded to those vested rights.

Despite the conspicuous absence of any language about trademark ownership in the 2004 Agreement, Sköld nevertheless argues that the 2002 transfer of the mark was undone by the 2004 Agreement. He further contends that the 2004 Agreement, *sub silentio*, both returned the mark to him and simultaneously retransferred the mark to CollaGenex under the "goodwill" provision of that agreement, but only

15

provisionally.[12]  For two reasons, we disagree that any such ownership ping-pong took place.  First, as already emphasized, the 2002 Agreement specifically provided that "any termination … shall not affect in any manner vested rights[.]" (App. at 1469.)  Thus, when that agreement terminated, CollaGenex continued to own Restoraderm, absent some clear documentation that ownership was changing hands again.  There is nothing of the sort.[13]

Second, we reject Sköld's interpretation of the phrase "hereof and thereof" in the 2004 Agreement's integration clause to include all subject matter in either the 2004 Agreement or the 2002 Agreement.[14]  *Sköld*, 2016 WL

---

[12]  The 2004 Agreement provided, in the event of termination by Sköld or CollaGenex, that CollaGenex would return certain assets, including related goodwill, to Sköld.

[13]  Accordingly, at summary judgment, the District Court erred in concluding that the goodwill provision was subject to two reasonable interpretations – *i.e.* the term included Restoraderm or the term did not include Restoraderm – requiring further fact-finding.  *Sköld,* 2016 WL 724755, at *5-6.  Because CollaGenex's ownership of the mark survived termination of the 2002 Agreement, Sköld had no rights to Restoraderm when he executed the 2004 Agreement.  Therefore he could not have transferred the mark under the "goodwill" provision or any other.

[14]  To repeat, that phrase appears in this context: "[The 2004 Agreement] … cancels and supersedes any and all prior negotiations, correspondence, understandings and agreements (including the [2002 Agreement]) whether oral or written,

16

724755 at *2. That phrase – "hereof and thereof" – includes only the subject matter shared between the two agreements. To interpret it otherwise, to include any subject matter in either agreement, would negate the difference between "hereof *and* thereof" and "hereof *or* thereof." The conjunctive phrase includes only shared subject matter and the disjunctive phrase includes any subject matter. Indeed, as a general matter, integration clauses are meant to act as "conclusive evidence that the parties intended to supersede any prior contract *on the same subject matter*." *ADR N. Am., L.L.C. v. Agway, Inc.*, 303 F.3d 653, 658 (6th Cir. 2002) (emphasis added). Since the 2002 Agreement encompassed trademarks, expressly including Restoraderm, and the 2004 Agreement did not, the prior transfer of Restoraderm is not contained in "the subject matter hereof and thereof" in the 2004 Agreement's integration clause. (App. at 1495.) So, even if one thought that a property right like the one at issue here, documented at a government agency and announced to the world, could be divested by broad and non-specific language in an integration clause, the 2004 Agreement did not affect CollaGenex's (and hence Galderma's) ownership of Restoraderm. *See Kreiss v. McCown De Leeuw & Co.*, 37 F. Supp. 2d 294, 301 (S.D.N.Y. 1999) (finding that provisions in a new agreement superseded provisions in an older agreement only to the extent that they covered the same subject matter even where the new agreement contained merger and

_____

between the Parties respecting the subject matter hereof and thereof; provided that nothing in this Agreement shall replace, supercede [sic], cancel or modify any prior agreements or assignments between the Parties that have been filed with the United States Patent and Trademark Office." (App. at 1495.)

17

integration clauses providing that the agreement "supersedes all prior arrangements or understandings … with respect thereto." (alteration in original)).

Accordingly, based on the unambiguous language of the 2002 Agreement, Galderma, as successor-in-interest to CollaGenex, became the rightful owner of the Restoraderm mark and remained so after the termination of that agreement. The 2004 Agreement did nothing to alter those rights. We reach that conclusion as a matter of law, based on the unambiguous language of the contracts.

Given that Sköld's unjust enrichment claim was premised on Galderma's use of the "Restoraderm trademark and related good will" being unlawful (App. at 1184), he was required to establish ownership of the mark to prevail. Because Galderma, not Sköld, is the rightful owner of the mark, its use of the mark is not unlawful or unjust, and Sköld's unjust enrichment claim fails. And, since Sköld's claims for infringement, false advertising, and unfair competition were also premised on ownership of the mark, each of those claims must fail as well.

## III.    CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgment in all respects, except for Sköld's unjust enrichment claim, which we will reverse.