**HERSHEY FOODS CORPORATION, Appellee,**

v.

**RALPH CHAPEK, INC., Appellant.**

No. 86–5726.

United States Court of Appeals, Third Circuit.

Argued April 10, 1987.

Decided Sept. 11, 1987.

---

Weyman I. Lundquist, Peter A. Wald, Andrea G. Asaro, (argued), Heller, Ehrman, While & McAuliffe, San Francisco, Cal., Robert A. Barton, Killian & Gephart, Harrisburg, Pa., for appellant.

David E. Lehman (argued), Franklin A. Miles, Jr., Stephen A. Moore, McNees, Wallace & Nurick, Harrisburg, Pa., for appellee.

Before SLOVITER, BECKER and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

This is an appeal from a grant of summary judgment by the district court in favor

of Hershey Foods Corporation and against Ralph Chapek, Inc. We affirm.

## I.

On August 13, 1981, Ralph Chapek, Inc. (Chapek), a marketing consulting firm, sent an unsolicited, seven-page licensing proposal to Hershey Foods Corporation (Hershey), in which Chapek proposed to assist Hershey in assessing the feasibility of marketing Hershey's chocolate milk and ice cream. App. at 59–66. The proposal outlined various studies to be undertaken by Chapek, as well as marketing plans and research. Id. at 62. The August 13, 1981 licensing proposal suggested two options by which Chapek would be compensated. "Option One" involved individual research studies to be conducted by Chapek. It also provided that Chapek would receive 15% of the first five years royalties and fees received by Hershey Foods Corporation "for the licensing of the Hershey Chocolate brand for use in the manufacture and sale of Hershey chocolate milk and ice cream, during the first five years."[1] App. at 65. Under "Option Two" Chapek would become the licensee of the Hershey Chocolate trademark for use in the manufacture, sale and store-door delivery of Hershey chocolate milk and ice cream. Under this option, Chapek would negotiate and pay to Hershey a royalty for all dairy products sold with the Hershey chocolate brand name to Chapek for sublicensing to local dairies. Id.

On October 27, 1981, Ralph Chapek, the president of Chapek; met in New York with Hershey's Director of New Products, Anthony Pingitore, to discuss Chapek's proposal. Only the two individuals were present. Chapek contends that at that initial meeting, Pingitore orally agreed, on Hershey's behalf, to "Option One" and committed Hershey to the 15% commission compensation arrangement as it pertained to Hershey's chocolate milk. In return, Chapek claims that it agreed to undertake the three specific research studies proposed in the August 13th proposal, i.e., the fresh chocolate milk and ice cream industry study, the brand impression and attitude and usage study, and a marketing research study with respect to six focus groups. App. at 65.

Three days later, on October 30, 1981, Chapek wrote to Pingitore and, referring to their October 27th meeting, set forth in its letter, an agreement into which Chapek and Hershey had entered. The agreement essentially provided that Chapek would perform a chocolate milk study for Hershey and Hershey would compensate Chapek in the sum of $17,500. The instant dispute between Chapek and Hershey focuses on this agreement: Chapek claiming that this, the October 30th agreement, is only a partially integrated agreement; Hershey claiming that it is the complete integrated agreement of the parties.

In addition to the August 13, 1981 licensing proposal for chocolate milk and ice cream which Chapek sent to Hershey, and the October 30, 1981 agreement involving the dairy industry and chocolate milk industry study for which Hershey paid $17,500, the record reveals other proposals and agreements. Chapek submitted six additional proposals to Hershey, each of which involved different research projects. Chapek was directed to proceed with three of these additional research projects. As to each, a separate agreement was negotiated. The other six written proposals made by Chapek were:

> a. Fresh chocolate milk and ice cream industry study. $17,500.
> b. Brand impression and attitude and usage study, 750 intercept interviews at $30.00 per interview. $22,500.
> c. Six focus groups at $1,500 each. $9,000.
> 3. Reimbursement of travel expenses, estimated at 10% to 15% of professional fees. App. at 65.

---

1. Option One of the proposed "professional relationship" between Hershey and Chapek provided:

    A. Option One—Commission Base
    1. 15% commission on first five years royalty and fee received by Hershey Foods Corporation for the licensing of the Hershey Chocolate brand for use in the manufacture and sale of Hershey chocolate Milk and ice cream.
    2. Chapek to conduct marketing research on assignment to Hershey Foods Corporation.

| | |
|---|---|
| Consumer marketing research, chocolate milk (1/20/82) (App. at 81) | Not accepted by Hershey |
| "50 Metro" proposal (10/7/82) (App. at 96–100) (referred to as the Licensing strategy proposal or "major market" study) | Accepted by Hershey and for which Hershey paid $50,000 |
| In depth market analysis (1/31/83) (App. at 114) ("broad scope study" portion) | Accepted by Hershey and for which Hershey paid $28,825 |
| Baked sweet goods proposal (4/20/83) (App. at 122–24) ("broad scope study" portion) | Accepted by Hershey and for which Hershey paid $20,125 (expenses included) |
| Frozen novelties (1/31/83) (App. at 140–42) | Not accepted by Hershey |
| Chocolate chip cookies (4/20/83) (App. at 143–57) | Not accepted by Hershey |

On August 22, 1983, Chapek wrote to Hershey claiming a commission calculated on "fifteen percent of the first five years' royalties and fees received by Hershey for the licensing of the Hershey Chocolate brand for use in the manufacturing and sale of Hershey Chocolate Milk to the dairy industry." Supp.App., Plaintiff's Ex. 20. Hershey rejected Chapek's claim and ultimately brought this action in the Middle District of Pennsylvania for declaratory relief on April 27, 1984. Hershey sought a declaration that it was not obligated to Chapek, under any legal or equitable theory, for commissions calculated on chocolate milk licensing royalties and fees. Chapek counterclaimed for breach of contract; for an award in *quantum meruit;* for damages for an implied breach of the covenant of good faith and fair dealing; and for damages for "false promise".

On April 5, 1985, Hershey moved for summary judgment. Hershey argued that the breach of contract claim should be dismissed because Chapek's proof of an oral agreement would be barred by the parol evidence rule. It asked for dismissal of the good faith and fair dealing claim as not recognized by Pennsylvania law. It sought dismissal of the *quantum meruit* and fraudulent misrepresentation claims because the material facts of the case would not support such causes of action. Her-

shey sought a judgment declaring Hershey free from any express or implied claims of Chapek.

The magistrate held that the October 30, 1981 letter written by Chapek as a result of the October 27th meeting and accepted by Hershey, integrated and incorporated every agreement between the parties as of that date. The magistrate further held that Chapek's good faith claim could not be sustained under Pennsylvania law, which was deemed to be applicable, and that the "false promise" count failed because there was no evidence that there was fraudulent intent on the part of Hershey and because it would negate Pennsylvania's parol evidence rule. As to the *quantum meruit* count, the magistrate ruled in favor of Hershey with two exceptions. Ultimately, those "exceptions" were removed from the case by a stipulation effected between Hershey and Chapek.[2] *See* App. at 445.

The district court approved the magistrate's report and recommendation, but modified the magistrate's holding, stating that "giving Chapek the benefit of all favorable inferences that might reasonably be drawn from the evidence, there is a reasonable basis for this court to conclude that the October 30, 1981 written contract integrates and incorporates every agreement between the parties as of that date." App. at 408. In its own opinion, the district court agreed with Hershey that the oral agreement of October 27, 1981, which Chapek claimed was a part of its agreement with Hershey, was proscribed by the parol evidence rule because it was offered by Chapek to vary, contradict, or otherwise attack the terms of the October 30, 1981 letter.

On September 9, 1986, the district court entered a judgment declaring that "Hershey Foods Corporation has no liability to Defendant Ralph Chapek Inc., and the Counterclaims of Defendant Ralph Chapek Inc. are dismissed." App. at 451.

**2.** The district court granted summary judgment on all *quantum meruit claims,* legal and equitable, except for those related to Chapek's services rendered in two discrete transactions— those relating to intelligence gathering concerned with an investigation of Nestle's choc- olate milk plans, and those relating to the arrangement of a meeting between Hershey representatives and Knudsen Dairy personnel in California. The parties by stipulation have eliminated these two claims from the scope of this appeal. App. at 445.

Chapek appealed, but on appeal abandoned the implied covenant of good faith issue and the issue of "false promise."

## II.

■ Chapek argues on appeal that, under Pennsylvania law,[3] the letter of October 30, 1981 did not constitute a fully integrated contract and that at the meeting with Pingitore on October 27, 1981, Pingitore orally agreed to "Option One" which was set forth in the August 13, 1981 licensing proposal. By this argument, Chapek claims that the 15% commission term of "Option One" became a part of its contract with Hershey.

Hershey responds that the October 30, 1981 "Dear Tony" letter is a complete and fully integrated document which cannot be varied by parol evidence. Because that letter does not include any provision for a 15% commission, Hershey argues that it cannot be bound to any commission arrangement. The October 30, 1981 letter reads in full as follows:

Dear Tony:

Per our meeting in New York City on October 27th, concerning Chapek conducting an industry study for the dairy category, this letter will serve as an agreement between Ralph Chapek, Inc. (hereafter Chapek) and Hershey Foods Corporation (hereafter Hershey). The details of the agreement are as follows:

1. Chapek will provide to Hershey a comprehensive study of the dairy industry in general and the chocolate milk market specifically for Hershey to evaluate a possible Hershey entry in the chocolate milk category.

2. The study and timing will be based on the attached research outline, with reasonable modification and additions by Hershey.

3. Chapek agrees to confidentiality of all research, findings and recommendations concerning research work conducted by Chapek for Hershey.

4. Hershey agrees to compensate Chapek:

a. Dairy Industry Study at $17,500 with 50% at project inception (see attached invoice statement) and 50% at project completion, with completion date estimated for February 1, 1982 or sooner.

b. Reimbursement of travel expenses for meetings at Hershey and other related meetings for trade interviews. Total reimbursement shall not exceed 15% of industry study cost or a maximum expense of $2,625.

After your review of the attached research outline, I suggest you relate to Chapek any additions or deletions Hershey may wish. We can then discuss the same over the telephone.

I might also suggest that we meet in New York at Doyle Dane again during the week of November 16th to finalize the research outline.

Thank you again for the opportunity to be of service to Hershey.

·Sincerely,
Ralph Chapek
President

App. at 68–69, 342. Our review of an order granting summary judgment such as the district court's order in this case, is plenary. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976).

### A.

Hershey argues as a threshold matter, that the parol evidence rule prevents Chapek from attempting to vary the terms of the October 30, 1981 letter by seeking to introduce evidence of a prior, oral agreement, which evidence would vary the terms of Chapek's compensation. Chapek, however, asserts that the oral agreement reached at the October 27, 1981 meeting is not offered to contradict or vary any of the terms of the October 30th letter, but rather is offered to supplement its terms. In support of that position, Chapek refers us to

---

**3.** The district court held that Pennsylvania law applies to this case. On appeal, Chapek does not argue otherwise.

*Potoczny v. Dydek,* 192 Pa.Super. 550, 162 A.2d 70 (1960), which states:

It is well settled that an oral agreement is not superceded or invalidated by a subsequent or contemporaneous integration, if the oral agreement is not inconsistent with the integrated contract, and is such an agreement as might be naturally made separately by the parties situated as were the parties to the written contract. (Citations omitted)

However, Chapek's reliance on *Potoczny, supra,* is misplaced. In *Potoczny,* A and B had orally agreed to purchase land from C; A to eventually own one-third and B to eventually own two-thirds of the property. It was orally agreed that the deed would initially be in B's name and that A and B would subsequently divide the land in the proportions mentioned. After receiving the deed for the entire parcel in his name, B refused to convey one-third to A. After A brought suit, the court ruled that B held one-third of the property in a resulting trust for A, who had paid a portion of the purchase price. In discussing the issue raised as to parol evidence, the court found the writing between B and C "... was not intended to, and did not properly, state the full agreement between [A and B]. Consequently, it was permissible to receive parol testimony...." *Potoczny,* 192 Pa.Super. at 558, 162 A.2d at 74. Indeed, neither A nor B sought to vary the terms of the deed given by C to B by parol evidence concerning the one-third/two-thirds division of the property.

Thus, in *Potoczny, supra,* the oral agreement (between A and B) was found to be the type of agreement "... as might naturally be made separately by parties situated as were the parties to the written agreement." *Id.* at 558, 162 A.2d 70. That situation is significantly different from the situation found here where Chapek seeks

to alter the terms of its written agreement with Hershey by adding still another term of compensation allegedly agreed upon prior to the parties' October 30th written agreement. *See* discussion *infra* at 998.

Moreover, the parol evidence rule under Pennsylvania law provides that when parties to a contract have reduced their agreement to writing, that writing will be the sole evidence of their agreement, and parol evidence may not be admitted to vary the terms of the contract in the absence of fraud, accident or mistake. " 'Where parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement.... All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract....' " *Scott v. Bryn Mawr,* 454 Pa. 304, 312 A.2d 592, 594 (1973) (quoting *Gianni v. R. Russell & Co.,* 281 Pa. 320, 126 A. 791 (1924) (citations omitted)).

The purpose of the rule is to "preserve the integrity of written agreements by refusing to permit the contracting parties to attempt to alter the import of their contract through the use of contemporaneous oral declarations." *Rose v. Food Fair Stores, Inc.,* 437 Pa. 117, 120–21, 262 A.2d 851, 853 (1970); *see also Crompton-Richmond Co., Inc.—Factors v. Smith,* 253 F.Supp. 980 (E.D.Pa.1966), *aff'd,* 392 F.2d 577 (3d Cir.1967).[4] The parol evidence rule applies if the writing represents the entire agreement between the parties.

■ Both Chapek and Hershey agree that the October 30, 1981 letter was written by Chapek, received by Hershey, and acted upon in accordance with its terms by

---

**4.** In *Crompton-Richmond Co., Inc.—Factors v. Smith,* 253 F.Supp. 980 (E.D.Pa.1966), *aff'd,* 392 F.2d 577 (3d Cir.1967), the defendant sought to vary the terms of a written guarantee by claiming that an oral agreement required certain conditions to be met before his guarantee obligation could be enforced. He claimed that the plaintiffs had agreed orally that the guarantee was not to become effective for one year, and then only if the plaintiffs had provided certain necessary financial backing. These oral conditions were not referred to in the written agreement. In comparing the two agreements, the court determined that the oral and written agreements related to the same subject matter, i.e., the defendant's guarantee to pay on a debt. The court further determined that there was a likelihood that the oral conditions would have been included in the written agreement. Therefore, the court excluded evidence of the oral conditions.

both parties.[5] Our task is to determine whether that letter is the final and complete expression of the parties' agreement. This determination is a matter of law to be decided by the court rather than a jury. *See Seidman v. American Express*, 523 F.Supp. 1107, 1109 (E.D.Pa.1981); *Walker v. Saricks*, 360 Pa. 594, 63 A.2d 9, 11 (1949).

*Crompton-Richmond*, 253 F.Supp. 980 (E.D.Pa.1966), *aff'd*, 392 F.2d 577 (3d Cir. 1977), detailed the manner in which that determination is to be made by explaining:

> That determination must be made by examining the writing and comparing it with the alleged oral agreement. If the writing and the oral agreement relate to the same subject matter and if the court concludes that the parties, situated as were the contracting parties, would normally have included both in one agreement, then the subject of the alleged oral agreement must be considered as having been covered by the writing.

*Id.* at 983.

In *Gianni v. R. Russell & Co.*, 281 Pa. 320, 126 A. 791 (1924), a Pennsylvania Supreme Court case cited in *Crompton, supra*, the lessee of an office building candy stand argued that he had made an oral agreement for the *exclusive* right to sell soda water. The court found that the written agreement of the parties—which permitted him to sell various goods, but did not mention an *exclusive* arrangement to sell soda water—barred consideration of the oral agreement. In so doing, it explained the analysis to be used:

> When does the oral agreement come within the field embraced by the written one? This can be answered by comparing the two, and determining whether parties situated as were the ones to the contract, would naturally and normally include the one in the other if it were made. *If they relate to the same subject matter and are so interrelated that*

*both would be executed at the same time and in the same contract, the scope of the subsidiary agreement must be taken to be covered by the writing.* This question must be determined by the court.

281 Pa. at 323–24, 126 A. 791 (emphasis added).

In the present case, the dispute we must resolve requires that we compare that which was said and agreed to—if it was—at the October 27, 1981 meeting between Chapek and Pingitore, with the letter agreement of October 30, 1981. As the issue has been refined, it appears that the only difference between Chapek's version of the parties' agreement and Hershey's version centers on whether Hershey agreed to pay Chapek a 15% commission on chocolate milk royalties for a period of five years.

If we conclude, as the magistrate and the district court concluded, that the October 30th letter and the subjects discussed at the October 27, 1981 meeting relate to the same subject matter and would normally have been included in one agreement, because they are so interrelated that both "agreements" would have been executed at the same time, then, as the court in *Gianni*, 281 Pa. at 324, 126 A. 791, instructs, "the subsidiary agreement [in this case, the subjects discussed at the October 27th meeting] must be taken to be covered by the writing [here, the October 30th agreement]." In that situation, all evidence relating to the October 27th meeting was inadmissible in evidence.

**B.**

■ We turn, therefore, to a comparison of the October 27, 1981 oral agreement and the letter agreement of October 30, 1981.

The October 27th oral agreement is alleged by Chapek to have been based on "Option One" of the August 13, 1981 li-

---

**5.** Correspondence may constitute a contract, *see, e.g., Keyser v. Margolis*, 422 Pa. 553, 223 A.2d 13 (1966); and it is not necessary for both parties to sign the writing if the parties, acting pursuant to its terms, evidence their acceptance. Here, both parties performed the agreement ac-

cording to its terms. Hershey received a dairy industry and chocolate milk market study and compensated Chapek according to the terms of the October 30, 1981 letter after Chapek had submitted a bill for those services.

censing proposal.[6] This proposal has three components. The first would provide a 15% commission to Chapek over the first five years of royalties received by Hershey for licensing milk and ice cream. The second provides for a number of marketing research studies, each with a stipulated price. The third provides for reimbursement of Chapek's travel expenses.

The October 30th letter agreement, which Hershey claims evidences the complete agreement of the parties, references in its preamble the October 27th meeting, and states that it is to serve as an agreement between Chapek and Hershey. The details of that agreement are then set forth, and they essentially consist of the following:

(1) Chapek would provide a confidential marketing research study of the dairy industry and specifically of the chocolate milk market.

(2) Hershey would compensate Chapek for this study in the sum of $17,500 (the same sum specified in Option One for a chocolate milk and ice cream industry study) and would do so in two stages. Hershey also would reimburse Chapek for travel expenses at the same rate as that provided in Option One, but with a ceiling on expenses.

A comparison of the two "agreements" reveals that they obviously relate to the same subject matter. Indeed, the very study mentioned in "Option One" to be performed for $17,500 was agreed to in the October 30th letter, with only incidental modifications. The ice cream study was deleted from the October 30th agreement even though "Option One" included both an ice cream study as well as a chocolate milk study. The manner and time of payment was spelled out in the October 30th agreement, as was the completion date of the project. There can be little question that

both parties were focusing on the marketing of Hershey's chocolate milk—the subject of the August 13th letter, the conceded subject of the October 27th meeting, and the express subject of the October 30th agreement.

Because of the interrelationship of the marketing of chocolate milk and the commission arrangement asserted by Chapek—an arrangement predicated upon royalties received for the licensing of the Hershey chocolate brand—there can be no doubt that the crux of the October 27th meeting and the crux of the October 30th letter are interrelated, and would normally find expression in one writing.

We are not persuaded by Chapek's argument that the October 30th letter was nothing more than a partial integration, confirming "certain details of a broader consulting arrangement pursuant to which Hershey agreed to pay Chapek a 15% commission on royalties and fees earned from Hershey's entry into the chocolate milk market." Appellant's Brief at 25. As can be seen, the October 30th letter does not furnish any greater detail with respect to the chocolate milk study than does the August 13th proposal. Moreover, as we have observed, the October 30th letter purports to memorialize that meeting, and states that it is to serve as an agreement between the parties. Significantly, neither the October 30, 1981 agreement nor any of the succeeding agreements which provide specific terms of compensation for the services to be performed by Chapek, refer to any commission arrangement or master agreement which would override the specific compensation to which the parties had agreed.[7]

To support its view that the letter of October 30th is a partial integration, Chapek analogizes this case to *Piccari v. Vardaro*, 195 Pa.Super. 557, 171 A.2d 807

---

6. *See* note 1, *supra*, for the text of "Option One."

7. Inexplicably, Chapek contends that its reading of "Option One" provides that the 15% commission to which Chapek believes it is entitled, would be paid if and when "national roll out" was achieved. Appellant's Brief at 26. "National roll-out" appears to be Chapek's term, and no

such provision appears anywhere in the August 13, 1981 licensing proposal, or in the October 30, 1981 letter. Nor does this condition, whatever its meaning, ever appear to have been a subject of the agreement between Hershey and Chapek, nor does the record disclose it was ever achieved.

(1961). In *Piccari*, an oral agreement for home construction which contained a commission provision was succeeded in time by a second written agreement to purchase lumber, which did not include a commission provision. The subjects of the oral contract (supervision and preparation of plans for a home) were separate from the subjects of the subsidiary agreement (labor and materials for the construction project). The later written contracts contained none of the services called for by the oral agreement, and indeed made no mention of the supervision agreement. The court refused to find complete integration in the later agreement. *Id.*

*Piccari*, however, is not precedent for the circumstances being considered here.[8] Unlike *Piccari*, there is no suggestion in the present case that the *prior, larger project* (the alleged oral agreement of October 27th) was a totally separate oral agreement which could stand on its own as an integrated agreement. Here, Chapek argues only that the prior "oral agreement" was meant to supplement the later written agreements, and that the "oral agreement" provided a term of compensation which was not included in the written agreement itself. But as we have already noted, the October 30th written letter agreement contained a comprehensive price term of $17,500 as well as time provisions for its payment. As Hershey in its brief succinctly points out, "... The plaintiff in *Piccari* sought to prove an *oral* contract; Chapek seeks to alter a clearly specified *term* of a written agreement." Appellee's Brief 19–20 (emphasis in original).

We find the case of *Keyser v. Margolis*, 422 Pa. 553, 223 A.2d 13 (1966), to be closer to the facts of this case. In *Keyser*, the plaintiff sought a one-third share of the profits of a wine brokerage business; he alleged that as part of his employment contract as a sales representative, it had been orally agreed that he would become a one-third partner. The only document setting forth the terms of the plaintiffs employment was a written memorandum sent by the defendant and initialed by the plaintiff. The memorandum, drawn to confirm the parties' earlier agreement, outlined the material terms of plaintiff's employment— specifically, his duties, salary and expense account. It did not discuss a partnership interest for plaintiff. The Pennsylvania Supreme Court refused to permit oral testimony of the partnership interest because it would vary or contradict the terms of the confirmatory memo. Instead, the court in directing summary judgment for the defendant held that the written memo was a complete and integrated written contract.

Just as the plaintiff in *Keyser* could not vary the terms of his compensation by a prior oral agreement, so too is Chapek's compensation in this case restricted to the terms of the October 30th written agreement with Hershey. Giving Chapek, the non-movant, the benefit of all inferences, as we must, we nevertheless cannot help but agree with the magistrate's conclusion that:

> It is most unlikely that the potential recipient of a potentially large sum under a contractual arrangement would memorialize in a written agreement the terms of a relatively small subpart of that agreement and omit to memorialize the more significant subpart(s). Defendant has not provided a rational explanation for a party to do so. Moreover, the subsequent course of contracting between the

---

**8.** The other authorities relied upon by Chapek are also inapposite. *International Milling Co. v. Hachmeister*, 380 Pa. 407, 110 A.2d 186 (1955) involved allegations of fraudulent misrepresentation by the seller in omitting a quality term from a written agreement. No such allegation of fraud is made in the case before us.

In *Kroblin Refrigerated XPress v. Pitterich*, 805 F.2d 96, 107–108 (3d Cir.1986), an action was brought on two written contracts—a noncompetition agreement and a sales agreement—related to the purchase of a holding company that owned a trucking company. One issue before the court was whether the terms of the noncompetition agreement were varied by the sales agreement. This court in applying Pennsylvania law, rested its decision to construe the two written agreements together upon the evidence contained within both documents that they were to be read together, and that "no single writing embodied the whole of the parties agreement." *Id.* at 108. Thus, *Kroblin* did not involve the problem of a prior *oral* agreement which is before us.

parties, involving the reduction of specific agreements for Chapek to perform specific services to Hershey for specific consideration, with written proposals and written acceptances, is inconsistent with the notion that there existed a master agreement binding Hershey to a far greater potential contractual liability to Chapek for largely undefined services. App. at 358. The magistrate's report, which was adopted by the district court and with which we agree, additionally points out that:

> Chapek drafted the October 30, 1981 agreement. This written agreement purportedly covered the oral agreement made on October 27, 1981. The exact services that Chapek would perform for the potentially large consideration of 15% of Hershey's fees and royalties were not clearly spelled out in any prior writing, including the August 13, 1981 written proposal. The licensing scheme can not be conceptualized as a different subject matter than the marketing studies. If, as Chapek contends, it was undertaking the specific marketing studies it undertook for specific amounts of consideration at a loss in recognition of its potential profit when the licensing scheme came to reality, the licensing scheme was certainly the same subject matter in Chapek's view as the marketing studies. This one matter was the matter that had brought Chapek and Hershey together, and was the only subject matter upon which they had dealt. The idea that the licensing scheme and the marketing studies were not the same subject matter fails when it is considered that these concepts were first articulated together by Chapek in its unsolicited August 13, 1981 proposal.

*Id.* at 359–60.

■ We are satisfied, despite the various arguments made by Chapek,[9] that the October 30, 1981 letter relates to the same subject matter as the October 27th discussions and constitutes the complete integrated agreement of Hershey and Chapek as of that date.

### III.

Chapek also argues that the district court erred by granting summary judgment on the *quantum meruit* claim in favor of Hershey, because Chapek claims genuine issues of material fact remain as to uncompensated services performed by Chapek.

### A.

■ *Quantum meruit* is a *quasi*-contractual remedy in which a contract is implied-in-law under a theory of unjust enrichment; the contract is one that is implied in law, and "not an actual contract at all." *Ragnar Benson, Inc. v. Bethel Mart Associates,* 308 Pa.Super. 405, 414, 454 A.2d 599, 603 (1982). In *Birchwood Lakes Community Association, Inc. v. Comis,* 296 Pa.Super. 77, 86, 442 A.2d 304, 308

---

9. Chapek suggests that certain conduct by Hershey subsequent to the October 30th letter demonstrates that the letter did not constitute the parties' integrated agreement; that Chapek "repeatedly asserted" its understanding that it would be compensated pursuant to "Option One" of the August 13, 1981 licensing proposal; and that Chapek performed services at Hershey's behest which it would never have performed but for a master agreement. In particular, Chapek calls our attention to a December 19, 1983 letter, which Chapek wrote, in which he states "You [Pingitore] proposed three options for Hershey to compensate Chapek in lieu of the 15% commission base you accepted previously ..." App. at 278. Chapek relies on this December 19, 1983 letter to argue that during certain negotiations, Hershey indicated that it owed Chapek the 15% commission.

As with all other correspondence on which Chapek relies, this letter was written by Ralph Chapek himself. Even accepting Chapek's claims, events occurring two years after the parties' written agreement cannot alter the terms of their original contract. *See Dunn v. Orloff,* 420 Pa. 492, 499–501, 218 A.2d 314, 318–19 (1966) (testimony of witnesses to events subsequent to execution of judgment note not admissible to vary terms of note; "[n]o case in Pennsylvania has ever gone so far as to permit the terms of a written contract to be altered or varied by such testimony [of subsequent events]."). This is particularly true when, as is true here, those events are offered for no reason other than to prove the existence of inadmissible parol evidence, in this case the existence of the 15% commission.

(1982), the Pennsylvania Superior Court explained that:

> A quasi contract, also referred to as a contract implied in law imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement when one party receives an unjust enrichment at the expense of another. *Schott v. Westinghouse Electric Corp.,* 436 Pa. 279, 259 A.2d 443 (1969); *Thomas v. R.J. Reynolds Tobacco Co.,* 350 Pa. 262, 38 A.2d 61 (1944); *Central Storage & Transfer Co. v. Kaplan,* 37 Pa.Commonwealth Ct. 105, 389 A.2d 711 (1978).

An action brought on a theory of *quantum meruit* sounds in restitution, *Overseas Development Disc. Corp. v. Sangamo Constr. Co., Inc.,* 686 F.2d 498, 510–11 (7th Cir.1982), and to sustain a claim of unjust enrichment, the claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that would be unconscionable for the party to retain without compensating the provider. *Torchia on behalf of Torchia v. Torchia,* 346 Pa.Super. 229, 499 A.2d 581 (1985).

Under Pennsylvania law, "the quasi-contractual doctrine of unjust enrichment [is] inapplicable when the relationship between the parties is founded on a written agreement or express contract." *Benefit Trust Life Ins. Co. v. Union Nat. Bank,* 776 F.2d 1174 (3d Cir.1985) (quoting *Schott v. Westinghouse, supra* ). Where an express contract governs the relationship of the parties, a party's recovery is limited to the measure provided in the express contract; and where the contract "fixes the value of the services involved," there can be no recovery under a *quantum meruit* theory. *Murphy v. Haws & Burke,* 235 Pa.Super. 484, 489, 344 A.2d 543, 546 (1975) (where an implicit contract existed between attorney and law firm, no separate *quantum meruit* recovery could be obtained).

#### B.

In support of its *quantum meruit* claim, Chapek refers generally to work it performed for Hershey, namely "nationwide research into the dairy industry," compiling and analyzing a broad range of "data regarding chocolate milk products and producers," and providing "extensive, ongoing business consulting services for Hershey in the new products field." Appellant's Brief at 27. Chapek also states that it "brought Hershey the detailed and distinctive licensing concept itself," and saved Hershey "the time and expense it would have had to incur to research, develop and introduce Hershey brand chocolate milk." *Id.* at 29. Chapek also asserts that it "would not have agreed to conduct the three assignments alone [i.e., the dairy industry study, the "50 Metro" market study, and the in-depth market analysis], merely for the fees Hershey paid, without more." *Id.* at 31.

Chapek itself, however, refers only to two specific instances in which Chapek performed services for Hershey in connection with the chocolate milk licensing project, for which it received no compensation. Appellant's Brief at 26. These instances concern the work performed by Chapek in relation to projects involving Nestle's Corporation and Knudsen's Dairy. However, any *quantum meruit* award due to Chapek for those services has been removed from the subject of this appeal. *See* note 2, *supra.*

We agree with the district court that all of the remaining services performed by Chapek fall within the scope of those individual and separate agreements into which Chapek and Hershey entered and for which Chapek was admittedly compensated. As we have earlier observed, where an express agreement governs the relationship between the parties, recovery is limited to the measure provided in the contract. *Quantum meruit* will not be awarded when there is an express agreement. *See Murphy v. Haws & Burke, supra.*

Our review of the record discloses that with the exception of Nestle's and Knudsen's claims, none of Chapek's *quantum meruit* allegations relate to services that are not included within the scope of the separate agreements entered into by Chapek and Hershey. Thus, Chapek makes a

*quantum meruit* claim that it "compiled data" regarding chocolate milk, despite the fact that this service was contemplated in the agreement of October 30th, which concerned a study of the dairy industry in general and the chocolate milk industry specifically—and pursuant to which Hershey paid Chapek $17,500.

Chapek's claim that it provided ongoing services for Hershey in the new products field, is based on the very services which Chapek performed according to the baked sweet goods agreement, and pursuant to which, Hershey paid Chapek $20,125. Appellant's Brief at 27. Chapek's claim that it contributed to Hershey the concept of licensing the Hershey brand name to dairies is based on the very subject covered by the dairy industry and chocolate milk industry agreement, the "50 Metro" agreement, and the "in-depth market analysis" agreement, for which Hershey paid Chapek $17,500, $50,000 and $23,825, respectively. Nor has Chapek documented any benefit which Hershey obtained unjustly as a result of the unsolicited proposals made by Chapek for projects which Hershey rejected. *See supra,* p. 992. Therefore summary judgment in favor of Hershey on the *quantum meruit* claim is appropriate.

■■■ As Hershey has pointed out in its brief, whether Chapek struck a "good deal," is not a genuine issue of fact which can preclude the entry of summary judgment if an express written contract governs. Appellant's Brief at 42. Since the record shows that Chapek received all the compensation that was due under its written agreement of October 30, 1981 and the subsequent agreements into which Hershey entered, Chapek cannot argue that its services were worth more than it received.

## IV.

We will affirm the Order of the district court dated September 9, 1986, in all respects.

BECKER, Circuit Judge, dissenting.

I believe that events following the October 30, 1981 letter, and in particular, certain statements by Hershey, clearly demonstrate that the October 30 letter was not intended to constitute the fully integrated agreement of the parties, but rather only memorialized a part of their agreement. I would therefore admit parol evidence and permit Chapek to prove Hershey's liability to it under "Option One."

The primary basis for this conclusion is that, when Pingitore and Chapek met in December 1983 to discuss Chapek's request that Hershey begin making the commission payments called for in Option One, Pingitore offered several compensation options *in lieu of the 15% commission.* (Appendix at 279 *et seq.*).[1] In my view, this offer evidences Hershey's understanding that it had entered into an ongoing consulting agreement with Chapek pursuant to Option One, and that it owed Chapek more than the fixed-sum payments set forth in Option One.

Second, the evidence is undisputed that Chapek performed services at Hershey's behest, including the Nestle investigation and the arrangement of the Knudsen Dairy meeting, for which Chapek was not paid. That Hershey requested Chapek to perform services outside the scope of the three specific assignments set forth under Option One provides evidence of the existence of a broader consulting agreement. It seems doubtful to me that Chapek would have performed these services gratuitously; rather it seems more reasonable to believe that it did so as part of an on-going consulting engagement, such as Option One embodies.

Additionally, Chapek specifically referred to Option One in the summary "Introduction" to the second assignment performed

---

1. A question arose at oral argument as to whether there was admissible evidence of Hershey's declarations. However, depositions reproduced in the post-argument submission of supplemental appendix materials make it clear that there is no such problem. *See* Post-Argument Submission of Supplemental Appendix Materials, and 283, 284, 300 (deposition testimony of Ralph Chapek relating statements of Anthony Pingitore, Hershey's Director of New Products). These depositions were before the district court in connection with the motion for summary judgment.

for Hershey—the "50–Metro" study. Conspicuously set out in the first paragraph of this report and read aloud to Mr. Pingitore was the following statement:

> The chocolate milk project at Hershey began with the submission of a concept proposal by Ralph Chapek, Inc., to Hershey Foods in August, 1981. *Hershey accepted Chapek's Option One* listed in the Proposal and work on the industry study listed in Option One was initiated in December, 1981.

(Appendix at 106; emphasis supplied.) This subsequent reference to Option One in the second study undertaken by Chapek and accepted by Hershey, which Hershey did not deny, is an arguable admission by Hershey that the parties proceeded pursuant to Option One, estopping Hershey from denying the existence of the "Commission Based" agreement.[2]

Moreover, in terms of the *quantum meruit* claim, Hershey's offer to discuss alternatives to the 15% commission constitutes an admission and demonstrates Hershey's recognition that Chapek had in fact performed extensive research and marketing services for which it had not been compensated. Pingitore's words and acts thus indicate both his own understanding of the nature and extent of Chapek's effort, and of the value of those services.

In view of the foregoing, I believe that evidence that Hershey accepted Option One of the Licensing Proposal is not offered to "vary or contradict" Chapek's October 30, 1981 letter, but rather to establish the existence of a broader consulting agreement between Hershey and Chapek. I believe that the evidence raises a serious question whether the October 30th letter constituted an integrated agreement. And I believe that, considering all the admissible evidence, there is a genuine issue of material fact as to whether the parties in fact agreed to Option One.

I intimate no view as to the likelihood of Chapek's success in proving what seems to be, for Chapek, an extraordinarily generous arrangement. On the other hand, Chapek appears to be a marketing "whiz" and it seems to have been Chapek that awoke the colossus of the chocolate world to the possibilities of marketing fresh milk products under its magic name. I would let a jury decide what the arrangement was. I respectfully dissent.[3]

---

**2.** Thereafter, in a proposal sent to Hershey concerning baked sweet goods Chapek reiterated its understanding that the parties were proceeding pursuant to Option One.

**3.** I do not find the case of *Dunn v. Orloff*, 420 Pa. 492, 499–501, 218 A.2d 314, 318–19 (1966), relied on by the majority, majority op. at 998 n. 9, apposite. The *Dunn* court recognized that "parol evidence is admissible to explain and supplement a written agreement where such evidence *clearly* shows that the writing in question

tion was not intended to and did not properly state the entire agreement between the parties." *Id.* at 496, 218 A.2d at 316 (emphasis in original). In *Dunn* the court rejected the proffered admissions because the evidence consisted entirely of interested witnesses' statements. In contrast, the record before the district court here included far more extensive evidence of admissions by Hershey that the agreement was not integrated.