**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-1756
_____

HARRY D. MARTIN,
Appellant

v.

SNAP-TITE, INC.; JOHN S. CLARK;
GEORGE P. CLARK; GARY L. CLARK
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 12-cv-00162)
District Judge:  Honorable Joy Flowers Conti
_____

Submitted Under Third Circuit LAR 34.1(a)
January 22, 2016
_____

Before: FISHER, CHAGARES and BARRY, <u>Circuit Judges</u>

(Opinion Filed: February 12, 2016)
_____

OPINION*
_____

---

* This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

BARRY, Circuit Judge

Harry Martin appeals from the order of the District Court granting summary judgment and dismissing his claims against John, George and Gary Clark.[1] We will affirm.

## I.

From 1940 until its sale in 2012, Snap-tite operated as a manufacturing business in Erie, Pennsylvania. Prior to the sale, and since at least 1965, the company was majority-owned by one or more members of the Clark family. Harry Martin, a friend of the Clarks, assisted Snap-tite in varied capacities for over forty years, serving as outside counsel and an outside member of the Board of Directors and the Long Range Planning Committee ("LRPC" or "the Committee"). He also claims to have provided management consulting services throughout his tenure.

Martin's professional relationship with Snap-tite can be broken down into three separate periods: 1965 to 2004, 2005 to 2008, and 2009 to 2012. At first, he was compensated by the company in two ways: $500 per meeting for his role on the Board of Directors, plus compensation for the legal services he provided to Snap-tite as a member of Elderkin, Martin, Kelly & Messina, P.C. (the "Elderkin Firm"). Martin retired from the practice of law in late 2004, but continued to serve on the Snap-tite Board. During the 2005 to 2008 time period, Martin was, again, paid on a per meeting basis, but also

---

[1] The claims against Snap-tite had earlier been voluntarily dismissed after the Clarks agreed to assume any liability the company owed to Martin. (A24-41.)

received additional compensation for management consulting services he allegedly provided the company—$104,999.92 in 2005, $122,666.64 in 2006, $93,333.35 in 2007, and $75,000.00 in 2008.[2] And although Martin's role essentially remained the same through 2012, his compensation structure changed significantly in 2009. At or around that time, the company increased Martin's Board pay to $32,000 per year and stopped providing him with any additional payment for his consulting services.

Martin's contractual claims deal mainly with this lost consulting income for the period of 2009 to 2012. The issue, as framed by the Clarks and the District Court, was whether this work was sufficiently distinct from his compensated Board and LRPC service to warrant recovery. Martin, naturally, maintains that it was. He submits that his consulting work during this period dealt with "a prospective sale of the company in 2010 and then the ultimate sale of the company in 2012." (Appellant's Br. at 9.) He claims to have spent roughly 2,000 hours advising the company about ways to maximize its value, preparing for the sale of a Snap-tite subsidiary, and guiding the company's ultimate sale to Parker Hannifin, including by and through his efforts to retain and work with the lawyers and investment bankers preparing for sale.

The Clarks maintain, however, that these services overlapped substantially, if not entirely, with Martin's role on the LRPC. That Committee was composed of the Clarks, Zachary Savas, David Nevins and Martin, all of whom were also members of the Board.

---

[2] While the precise amount paid to Martin is in dispute, he concedes that the discrepancy is immaterial for the purposes of this appeal.

They convened roughly six times per year, four times concurrent with quarterly Board meetings. The "goal" of the LRPC, in Martin's words, was to "sharpen up [the company] for eventual sale." (A143). He did not receive additional compensation for his role on the Committee; he "considered [it] as part of being on the [B]oard." (A150.)

This apparent overlap notwithstanding, Martin requested additional compensation for his consulting work on two occasions. One month before Snap-tite was sold to Parker Hannifin, Martin wrote a letter to John Clark and, echoing a prior conversation in November 2011, sought several million dollars in compensation for work he claimed to have performed for the company. Martin informed Snap-tite that he "believe[d]" he was "entitled to a bonus because of [his] contributions to enhancing shareholder value," and pointed to "two major contributions" in support. (A388.) First, he assisted the company's purchase of Autoclave Engineers in 1995. And, second, it was his idea to redeem shares of stock at the time of George Clark's death in 2002. Although admitting that he "never raised this issue before" and that it "[was] awkward for [him] to press [his] own advantage while reducing the advantage for the Clark family," he nonetheless asked for a "bonus" of $300 per share.[3] (*Id.*) Martin was "count[ing] on [the Clark family's] fairness and appreciation of [his] part in this venture," but his request for additional compensation was denied. (*Id.*) This lawsuit followed shortly thereafter.

II.

---

[3] With 13,068.2 shares outstanding as of the company's sale, Martin's request would have amounted to a bonus of $3,920,460.

The amended complaint contains four counts: one for breach of express contract, one for breach of an implied-in-fact contract, and two for unjust enrichment.[4] The District Court granted the Clarks' subsequent motion for summary judgment and dismissed Martin's claims in their entirety in an order dated February 27, 2015.

The District Court first considered and dismissed Martin's claim that he had a contract implied-in-fact with Snap-tite, pursuant to which the company was obligated to pay him $1,640,000 for consulting services he provided between December 2008 and April 2012. The Court held that Martin's express contract for his Board and LRPC service foreclosed the possibility of an implied contract and additional compensation for the same work. In dismissing his unjust enrichment claims in counts three and four, the Court held that "the services Martin provided to Snap-tite were in his capacity as a Board member for which he was paid, or in his capacity as an attorney with the Elderkin firm for which he was paid through the law firm." (A23.) Martin's appeal timely followed.

### III.

The District Court had jurisdiction under 28 U.S.C. § 1332(a)(1), and we have jurisdiction under 28 U.S.C. § 1291. We apply the same standard as the District Court. *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 256 (3d Cir. 2013). Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact

---

[4] Martin conceded in his opposition to the motion for summary judgment that "discovery has revealed no writing, or specific exchange of promises, that established" his claim for breach of an express contract. (A558.) The District Court summarily dismissed count one on that basis, and Martin does not attempt to resurrect the claim on appeal. (A12.)

5

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *S.H.*, 729 F.3d at 256.

## IV.

Martin raises three arguments on appeal, none of which is persuasive. First, he argues that, because his consulting work was "much different" from that ordinarily expected of a corporate director, the District Court erred in finding those services to be an aspect of his role on the Board and LRPC. (Appellant's Br. at 18.) Second, he argues, in the alternative, that the record is inadequate to establish the terms of his express contract, making it "impossible to decide" whether his work actually was "encompassed by his role as a director and committee member." (Appellant's Br. at 19.) Finally, he argues that his unjust enrichment claims should proceed because the work on which those claims are based was different from the work for which he previously was compensated, either in his capacity as outside counsel or member of the Board.

### A.

Under Pennsylvania law, an implied-in-fact contract will not be found "when the parties have an express agreement dealing with the same subject." *Mill Run Assocs. v. Locke Prop. Co., Inc.*, 282 F. Supp. 2d 278, 293 (E.D. Pa. 2003). "To be valid, [the] implied contract must be entirely unrelated to the express contract." *Turkmenler v. Almatis, Inc.*, 2012 U.S. Dist. LEXIS 44027, at *10 (W.D. Pa. Mar. 28, 2012) (internal

6

quotations omitted).  Martin fails to demonstrate as much here.

Martin claims that Snap-tite owes him $1,640,000 in consulting fees pursuant to an implied-in-fact contract covering the approximate period of December 2008 to April 2012.  He argues that, pursuant to this agreement, he advised the company about ways to "maximize" its value for sale; participated in "negotiations" and provided "tax advice" regarding sale of a subsidiary and the potential sale of the company itself; identified other potential buyers after that sale fell through; and performed "extensive work" with regard to the company's ultimate sale to Parker Hannifin.  (A408-09).

This work was entirely indistinct from that performed pursuant to Martin's express contract for service on the Board and the LRPC, the contours of which were clearly established by his own testimony.  (A143) ("The goal of the Long Range Planning Committee was to sharpen up Snap-tite for eventual sale.").  His attempts to distinguish the substance of each "agreement" falls well short.  Martin points primarily to his relationship with the lawyers and investment bankers involved with the sale to Parker Hannifin—he claims to have been "heavily involved" in hiring attorney Lee Charles and investment banker Peter Lieberman, and to have "worked closely with both throughout their relationship with Snap-tite on matters of analysis, strategy and negotiations." (Appellant's Br. at 11.)  He maintains that no other outside director was as involved as he, and asks us to infer therefrom that such service was thus sufficiently distinct from his role on the Board and the Committee.  But even accepting this as true, Martin establishes only that he worked *more* than others on the Committee toward the Committee's

7

undisputed purpose. This is insufficient to establish that his work as a "consultant" was "entirely unrelated" to his work on the Board and the Committee, *see Turkmenler,* 2012 U.S. Dist. LEXIS 44027, at *10, and, as such, his claim was rightly dismissed.[5]

## B.

A claim of unjust enrichment requires the plaintiff to "show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that would be unconscionable for the party to retain without compensating the provider." *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987) (applying Pennsylvania law). Such a claim may not be stated where an express contract exists. *Premier Payments Online, Inc. v. Payment Sys. Worldwide*, 848 F. Supp. 2d 513, 527 (E.D. Pa. 2012); *Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. Ct. 2006) ("By its nature, the doctrine of quasi-contract, or unjust enrichment, is inapplicable where a written or express contract exists.").

Martin asserts two distinct claims of unjust enrichment. First, as an alternative to the implied-in-fact contract claim, he seeks the same $1,640,000 for services provided between December 2008 and April 2012. And, second, he seeks just under $4 million for his apparently successful efforts to increase the amount realized by Snap-tite's

---

[5] The Clarks also submit that the implied-in-fact contract should be dismissed for two separate reasons: first, that the terms of Martin's alleged contract are insufficiently specific to enforce and, second, that the alleged contract is barred by Pennsylvania's Business and Corporation law, which requires that all contracts between a corporation and its directors be disclosed and approved or ratified by the Board. Because we will affirm the District Court's dismissal of Martin's implied-in-fact claim for the reasons explained above, we need not reach these arguments.

shareholders upon the sale to Parker Hannifin. Each claim fails for the same reason: he was already compensated for the work performed.

Martin was paid $32,000 per year for his Board service pursuant to an express contract, which encompassed his service on the LRPC. The sole purpose of that Committee was to ready Snap-tite for sale, and he may not recover additional compensation—$1,640,000 here—for the same services under an unjust enrichment theory. *See Herbst v. Gen. Accident Ins. Co.,* 1999 U.S. Dist. LEXIS 15807, at *27 (E.D. Pa. Sept. 30, 1999) (dismissing unjust enrichment claim for discretionary bonus where the employee failed to show "that he did anything more than work to the best of his abilities for [the] defendant as he was engaged to do"). It is also undisputed that Martin's then-employer, the Elderkin Firm, was compensated for Martin's representation of Snap-tite in connection with the Autoclave transaction and his representation of George Clark's estate regarding the stock redemption—*i.e.*, the two areas of work he now argues give rise to his $4 million unjust enrichment claim. *See Hershey Foods Corp.,* 828 F.2d at 999-1000 (rejecting unjust enrichment claim brought by consulting firm because it was already paid for the work under an express agreement).

These undisputed facts are fatal to his unjust enrichment claims. *Kia v. Imaging Sciences Int'l, Inc.*, 735 F. Supp. 2d 256 (E.D. Pa. 2010), relied on by the District Court, is instructive. The plaintiff there was hired at a fixed salary, but claimed he was promised that he would be compensated on "par" with the company's five owners as the company grew. *Id.* at 263. The company was later sold, and the plaintiff sued based on

9

his dissatisfaction with the bonus received under a theory of unjust enrichment. The court found that, even assuming his work "actually contributed to the increased value of the company," his claim must nonetheless fail because he had an express contract with the company and its enrichment was therefore not unjust. *Id.* at 269. Significantly, the plaintiff failed to show "that he provided the defendants with anything more than the work he was hired to do." *Id.*

Such is the case here. The doctrine of unjust enrichment "does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff." *Id.* (quoting *Styer v. Hugo*, 736 A.2d 347, 350 (Pa. Super. Ct. 1993)). As the District Court aptly found, "all the services Martin provided to Snap-tite were in his capacity as a Board member for which he was paid, or in his capacity as an attorney with the Elderkin firm for which he was paid through the law firm." (A23.) Martin's claims for unjust enrichment cannot stand because an express contract governs that same relationship. He could not have reasonably expected to share in the proceeds of Snap-tite's ultimate sale absent a separate agreement promising the same.

V.

The February 27, 2015 order of the District Court will be affirmed.

10